LeRoy B. McMANAMAN, Appellant,

v.

UNITED STATES of America, Appellee.

Rubie Charles JENKINS, Appellant.

v.

UNITED STATES of America, Appellee.

Nos. 7322, 7323.

United States Court of Appeals Tenth Circuit.

Jan. 28, 1964

Rehearing Denied Feb. 11, 1964.

---

Ernest J. Rice, of Doherty, Rice & Benfer, Topeka, Kan., for appellant Le-Roy B. McManaman.

Elmore A. Page, Tulsa, Okl., for appellant Rubie Charles Jenkins.

Benjamin E. Franklin, Asst. U. S. Atty., Topeka, Kan. (Newell A. George, U. S. Atty., Topeka, Kan., on the brief), for appellee.

Before PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

A four-count indictment was returned in the United States District Court for the District of Kansas, charging four persons [1] with receiving and concealing automobiles moving in interstate commerce, knowing them to have been stolen, and for conspiracy. Count 2 of the indictment charged that the appellants, LeRoy B. McManaman and Rubie Charles Jenkins so received and concealed a 1960 Chevrolet Impala 4-door Sedan. Count 3 charged that they received and concealed a 1960 Ford Fairlane 500. Appellants were found guilty on counts 2 and 3 and of the conspiracy alleged in count 4. Each was sentenced to imprisonment for a term of 5 years on count 2, and a like sentence on count 3 to be served concurrently with the count 2 sentence. The sentence on count 4 was for a period of 3 years, to run consecutively with the sentences imposed on count 2. Separate appeals from the convictions were consolidated.

■ At the outset, it is urged that the trial court erred in denying a motion to discharge the jury panel. In substance, it is contended that the jury panel did not represent a cross-section of the community inhabitants and "was over-weighted with people from an upper income bracket." The Deputy Clerk of Court testified that the names of approximately 500 prospective jurors were placed in the jury box from which the panel was chosen. These names were furnished by designated persons throughout the district who were instructed to select only persons who had the necessary qualifications of jurors. There was no proof of any irregularities in the selection of the names placed in the jury box or that there was an arbitrary or systematic course of conduct to exclude any class of persons from the names submitted. To substantiate their position that the entire jury panel should have been discharged, appellants sought to establish that it did not contain representatives of persons with low annual incomes. The court refused to interrogate the members of the panel to discover their "economic status." It is insufficient, to sustain a challenge to the legality of a jury panel, to show only that a particular group of persons is not represented. The test of the validity of the panel is whether there has been a systematic attempt to exclude a particular class or group which is eligible for jury service. As we said in Windom v. United States, 260 F.2d 384, 385:

"In the exercise of superintending power in the administration of federal criminal justice, the appellate courts have been quick to strike down any conviction by a jury in the selection of which members of any race, creed or economic status are systematically excluded. * * *

"But the burden of making a showing that some class was improperly excluded from the jury lies with the defense. Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187. * * * *"

See also Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187, reh. denied 336 U.S. 907, 69 S.Ct. 488, 93 L. Ed. 1072; Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; Padgett v. Buxton-Smith Mercantile Co., 10 Cir., 283 F.2d 597, cert. denied 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705; Bary v. United States, 10 Cir., 248 F.2d 201, cert. denied 359 U.S. 934,[2] 79 S.Ct. 649, 3 L.Ed.2d 635.

---

1. The defendants Burton Herpel and Charles Teschner were not tried with the appellants McManaman and Jenkins.

2. In Bary v. United States, 10 Cir., 248 F.2d 201, 206, the court said:
 "While officials charged with the responsibility of selecting names of persons for service on grand and petit juries may exercise some discretion to the end that competent persons be selected, it is the long and unbroken tradition that methods and procedures must be employed which contemplate grand and petit juries from and truly representative of the cross-section of the community. It is not essential however that every grand jury or petit jury include representatives of all racial, economic, or social groups of the community. Neither is exact proportional

## 24

■ The appellant McManaman contends that he is entitled to a new trial because the court unduly limited the cross-examination of the government's witnesses and that remarks by the court during the trial and statements of government counsel in closing argument were prejudicial. The limitation of cross-examination is discretionary with the court, and the exercise of that discretion will be overruled only upon abuse which is clearly prejudicial. Darby v. United States, 10 Cir., 283 F.2d 896; Foster v. United States, 10 Cir., 282 F.2d 222. We find no limitation of the right of cross-examination which even borders on the abuse of that discretion. The remarks of the judge, to which objection was made, related to a government witness whose reputation was concededly bad, and who had given information to federal and state officials in connection with the handling of stolen automobiles. On cross-examination, in referring to the witness, an F.B.I. agent was asked: "Well, certainly in your capacity you determined the type of person you were dealing with, didn't you, or did it matter?" The court did not sustain an objection to this question, but stated: "I don't think the jury is—there is any question in the jury's mind about the character of Jack Doyle. I don't think it is very material." Obviously, the court was referring to the admitted questionable character of the witness, and, if anything, the remarks were helpful to the defendant.

■ The remarks of government counsel in closing argument which are said to be prejudicial were: " * * * We are not dealing with any amateurs." "Even these defendants, I truly believe, are entitled to a fair trial. * * *" "I opened my closing statement by say-

ing we are not dealing with ordinary violators." These remarks were not of a character as to deprive the defendants of a fair trial and were not unwarranted by the record. "The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial." Isaacs v. United States, 8 Cir., 301 F.2d 706, 736, cert. denied 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58; Bary v. United States, supra. Furthermore, no objections were made to the remarks at the time, and they will not be considered on appeal in the absence of error prejudicial to the fundamental rights of an accused. Isaacs v. United States, supra; Paschen v. United States, 7 Cir., 70 F.2d 491; Orebo v. United States, 9 Cir., 293 F.2d 747, cert. denied 368 U.S. 958, 82 S.Ct. 402, 7 L.Ed.2d 389.

■ The appellant Jenkins contends that the evidence was insufficient against him to sustain the verdict on either count 2 or 3, or on the conspiracy charge. In count 3 he and McManaman were charged with receiving and concealing a 1960 Ford Fairlane 500 automobile moving in interstate commerce knowing it to have been stolen. The evidence is without dispute that this car was stolen from the premises of an automobile dealer at Sarcoxie, Missouri during the night of September 8, 1960, and on September 27th it was observed in the possession of and being driven by Jenkins in Topeka, Kansas. At this time the auto displayed a Nebraska license and the original serial number had been replaced. On September 29, 1960, Jenkins was again seen driving the Ford. On both occasions defendant McManaman accompanied Jenkins. Later, on September 29, 1960, when Jenkins was arrested, he was in possession of the keys to the Ford, and

representation of ethnic, economic, or social groups a prerequisite to validity. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839. But an indictment returned by a grand jury or a verdict of guilty returned by a petit jury in a criminal case cannot stand if representatives of such groups were

systematically and arbitrarily excluded from the list of persons from which such grand jury or petit jury was chosen. Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866."

also a slip of paper upon which was written a number corresponding to the serial number then on the Ford. Without explanation, this evidence was sufficient to warrant an inference of guilty possession. Williams v. United States and Meier v. United States, 10 Cir. 323 F.2d 90; Seefeldt v. United States, 10 Cir., 183 F.2d 713 [3]; United States v. Guido, 2 Cir., 200 F.2d 105; United States v. Angel, 7 Cir., 201 F.2d 531.

We have, however, been unable to find any evidence in the record which connects Jenkins with the receipt and concealment of the Chevrolet automobile described in count 2. The fact that he may have been an associate of McManaman who had previously disposed of the Chevrolet in Topeka is not adequate. The record is totally lacking of any evidence to show that Jenkins had anything to do with this car, or that he had received or concealed it, and his conviction on count 2 must be set aside.

 Jenkins does not question the existence of the conspiracy alleged in count 4 of the indictment, but maintains that there is a total lack of evidence to show that he participated in it. It is seldom possible to prove conspiracy by direct evidence, but a conviction will be upheld where the circumstances, acts and conduct of the parties are sufficient to establish that they entered into an agreement to commit the crime charged, which is followed by an overt act to carry out the agreement. Blackford v. United States, 10 Cir., 195 F.2d 896, cert. denied 343 U.S. 945, 72 S.Ct. 1041, 96 L.Ed. 1350. It is not essential that each conspirator participate in all the activities of the conspirators in furtherance of the conspiracy or have knowledge of such activities. It is sufficient if the conspiracy is established and that the convicted persons knowingly contributed their efforts in furtherance of it. Young v. United States, 10 Cir., 168 F.2d 242,

cert. denied 334 U.S. 859, 68 S.Ct. 1533, 1534, 92 L.Ed. 1779, 1780; Berenbeim v. United States, 10 Cir., 164 F.2d 679, cert. denied Schechter v. United States, 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113.

The evidence is without conflict that the defendant Herpel, in July, 1960, sold a stolen automobile to a dealer in Topeka known as "Jack Doyle", and made arrangements for the delivery of others in the future for what was termed "good prices." Doyle notified local police and agents of the F.B.I. of his dealings, and each vehicle delivered thereafter was examined by the officers and found to have been stolen. In each instance it was discovered that the serial number on the door post had been removed and replaced by another number which did not correspond with the confidential serial number located elsewhere on the automobile. It was also established that the title papers, although issued by state authorities, usually in Nebraska, corresponded with the door post serial number, but not the original serial number. Sometime during the transactions with Herpel, the dealer received a telephone call from McManaman, who identified himself as a friend of Herpel's and stated he desired to talk to him about the purchase of automobiles. At a meeting resulting from the telephone call, McManaman advised Doyle there were cars in an Oklahoma warehouse that could be delivered to him on a cash basis. On September 13, 1960, McManaman again called Doyle and discussed the possibility of selling cars on a strictly cash basis. On September 27, 1960, Doyle purchased the 1960 Chevrolet Impala described in count 2 of the indictment from McManaman. The original public serial number on the Chevrolet had been replaced, and the title papers were counterfeit. On the same day, after the Chevrolet transaction, McManaman and Jenkins appeared at Doyle's place of business in the 1960 Ford Fairlane 500

3. In Seefeldt v. United States, 10 Cir., 183 F.2d 713, 715, the court said: "Possession by the defendant of the recently stolen automobile justifies the inference that the possession is guilty possession and may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence."

driven by Jenkins, and attempted to sell the automobile to him. Doyle obtained possession of the Ford and notified F.B.I. agents, who, on examination, found that the Ford had been recently stolen in Missouri, that its public serial number had been replaced, and that counterfeit title papers, together with license plates, had been obtained in Nebraska. This is the automobile described in count 3 of the indictment. During the negotiations, McManaman and Jenkins were staying together in a motor court in Topeka, and the negotiations were with both of them.[4] When McManaman and Jenkins were later arrested, Jenkins, in addition to the keys to the Ford and a slip of paper with a number written on it corresponding to the replaced serial number on the Ford, also had in his possession the key to a room in the Topeka motor court. When this room was searched, the officers found 9 envelopes under a mattress. Each envelope contained a bill of sale, an Alabama registration, and a serial plate for an automobile. The name written on the outside of each envelope corresponded to the name on the documents it contained. A piece of red plastic-covered wire with a clamp attached and taped with friction tape at the connection was also found. In the 1960 Ford, the officers found a set of red plastic-covered ignition "jumper wires" with three clamps attached, and each connection taped with friction tape; a roll of friction tape; a roll of red plastic-covered wire; a tube of liquid solder[5]; and an envelope containing a bill of sale, an Alabama registration, and serial plate for an automobile. The name written on the outside of the envelope corresponded with that on the documents which it contained. Also found in the 1960 Ford was a .22 caliber Baretta pistol, which was identified as having been in the 1960 Chevrolet Impala the night it was stolen in Nebraska. An F.B.I. expert testified that the friction tape removed from the wires found in the motel room and in the Ford, came from the roll taken from the car.

4. As to this transaction, Doyle testified:
"Q. I'll ask you whether or not you have seen either of these defendants in a 1960 Ford Fairlane 500? A. Yes. * * * I did.
"Q. (By Mr. Franklin) When was that? A. The 28th of September, I believe.
"Q. And, how did it happen that you saw them on the 28th? A. I went out to dinner with them at the Holiday Inn, south on South Topeka Boulevard.
"Q. And, did you have occasion to see this automobile again? A. I did.
"Q. When was that? A. The next day.
"Q. And where was that? A. They came to my lot.
"Q. And, did you have occasion to be in their company during that time? A. I walked out to their car. They wanted to go get something to eat, and I sent them up to Poor Richard's Cafe on West Sixth.
"Q. Now, did you—did you state whether or not you knew where McManaman and Jenkins were staying on the day in which you saw this 1960 Ford Fairlane 500? A. Ace Motel in North Topeka.
"Q. Did you have occasion to be out there? A. I did.
"Q. And, how did it happen that you were out there? A. They wanted money. I went out there with them to bring this car back.

"Q. What car was this? A. This Ford we are speaking about just now. And I brought it back and the FBI examined it.
"Q. And then what did you do with the Ford? A. I took it back to them.
"Q. Where? A. To the Ace Motel.
"Q. Would you state where they were—what rooms they were living in at this hotel? A. It was in the higher numbers, between the thirties and forties. I inquired of the maid on duty where this certain room was located, and she tole (sic) me, 'Down at the back of the motel.'
"Q. And when you approached the motel, who did you first see? A. McManaman. * * *
"Q. And, did you have a conversation with these defendants that is McManaman and Jenkins, at that time? A. I did.
"Q. Would you state the context of that conversation? A. The contents of it was about money for the automobile, and how soon I could get the money, raise the money for it. I told them that I— the only way I could do it was look for a buyer and put it on my lot—premises to resell this car."

5. The new serial number on the Ford, as on the other stolen cars, was attached by using liquid solder.

Considering the evidence as a whole, and the inferences to be drawn therefrom, we are satisfied that it is sufficient not only to establish the unlawful conspiracy, but that Jenkins and McManaman were a part of it.

The judgment and sentence as to the appellant Jenkins on the 2nd count is reversed. In all other respects, the judgments and sentences are affirmed.